**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| _____ | No. |
| MARTIN BACKER and REBECCA MCGUIRE, individually and on behalf of all others similarly situated, | **ORIGINAL COMPLAINT CLASS ACTION** |
| Plaintiffs, | |
| v. | |
| FANDUEL, INC., | |
| Defendant. | |

## I.     INTRODUCTION

Plaintiffs Martin Backer ("Plaintiff Player") and Rebecca McGuire (Plaintiff Family Member") ("Plaintiffs"), individually, and on behalf of all others similarly situated, by and through counsel, bring this action against FanDuel, Inc. ("FanDuel" or "Defendant") in this Original Complaint.

## II.     NATURE OF THE ACTION

1.     This is a class action complaint against FanDuel, a company operating Daily Fantasy Sports ("DFS") websites in a manner that violates Tennessee Law.

2.      Plaintiffs bring this action on their own behalf and on the behalf of two Tennessee classes of persons (defined in the definition of Classes below) who, like Plaintiffs, have sustained ascertainable losses arising out of FanDuel systematic and continued violation of the Tennessee Code Annotated and various criminal laws (the "Class Members").  Under the authority of § 29-19-104-105, the loser of any kind of gambling or betting can maintain a private, civil action to recover the money or goods lost within ninety (90) days, and if brought for the use of the spouse, child or children, or next of kin, within twelve (12) months from the expiration of the ninety (90) days.  When the term "Class" or Classes" is used herein, it shall refer to both Classes defined below (in Section VI) unless otherwise noted by the specific use of either "Player Class" or "Family Class."  When the term "Player Class Members" is used, it shall refer to all putative members of the Player Class.  When the term "Family Class Members" is used, it shall refer to all putative members of the Family Class.  When the term "Class Members" is used, it shall refer to all putative members of the Player Class and Family Class.

3.      FanDuel is operating an illegal online sports betting (gambling) business within the State of Tennessee.

4.      The Constitution of the State of Tennessee expressly states (emphasis added):

2

**Article XI, Section 5.   Lotteries.** *The Legislature shall have no power to authorize lotteries for any purpose, and shall pass laws to prohibit the sale of lottery tickets in this state*, except that the legislature may authorize a state lottery if the net proceeds of the lottery's revenues are allocated to provide financial assistance to citizens of this state to enable such citizens to attend post-secondary educational institutions located within this state. The excess after such allocations from such net proceeds from the lottery would be appropriated to

> (1) Capital outlay projects for K-12 educational facilities; and

> (2) Early learning programs and after school programs.

Such appropriation of funds to support improvements and enhancements for educational programs and purposes and such net proceeds shall be used to supplement, not supplant, non-lottery educational resources for education programs and purposes.

All other forms of lottery not authorized herein are expressly prohibited unless authorized by a two-thirds vote of all members elected to each house of the General Assembly for an annual event operated for the benefit of a 501(c)(3) organization located in this state, as defined by the 2000 United States Tax Code or as may be amended from time to time.

A state lottery means a lottery of the type such as in operation in Georgia, Kentucky and Virginia in 2000, and *the amendment to Article XI, Section 5 of the Constitution of the State of Tennessee provided for herein does not authorize games of chance associated with casinos, including, but not limited to, slot machines, roulette wheels, and the like*.

The state lottery authorized in this section shall be implemented and administered uniformly throughout the state in such manner as the legislature, by general law, deems appropriate.

3

5.      Throughout this operative Complaint, a reference to "betting" or "bet(s)" shall also have the meaning of "gambling" or "gamble(s)," respectively, and such words shall be used interchangeably herein.

6.      FanDuel a defines its sports betting scheme as DFS in a specious attempt to circumvent Tennessee law which expressly prohibits "gambling" and "betting."  FanDuel sports betting contests are based upon the performance of teams and individuals that participate in NCAA college football, NCAA college basketball, NFL, NBA, MLB and NHL, and also upon the partial or final result of games.

7.      In traditional fantasy sports leagues contestants draft their teams before the season, maintaining the same core roster for months.

8.      In contrast to season-long fantasy sports, FanDuel accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes and teams engaged in amateur and professional athletic competitions.

9.      After the sporting events are concluded, FanDuel calculates a score using the scheme they created that awards points based upon the various individual college and professional athletes' performance and pays bettors that have the highest total number of points.

4

10. Players select an entry fee, which is up to $5,000, and the number of the games or teams they wish to play. If their roster generates more points than their rivals on that day or week, they win all the money in the pot, minus FanDuel's average cut of, upon information and belief, 6.5%.

11. Upon information and belief, FanDuel uses "bots" or fake accounts to act as "shills" in the gambling scheme in order to stimulate and increase the dollar amount of play of actual bettors and to increase the "house" take from that play, and also to create the illusion among actual bettors of interacting with other actual bettors on equal footing, which is untrue and is a ruse.

12. Recently, lawmakers have scrutinized FanDuel's business model and operations, alleging substantial similarities between FanDuel and online poker and other gambling websites. For instance, the General Counsel for the Georgia State Lottery, Joseph Kim, wrote FanDuel and noted that Georgia's constitution bans gambling except for state lottery activities. *See* **Exhibit A**; *see also,* http://bigstory.ap.org/article/d2f22b64c83748468dfc6e4d84f8b001/georgia-joins-states-scrutinizing-fantasy-sports-companies. Also, the Attorney General of Georgia is currently investigating the legality of DFS sites like that of FanDuel's. *See* http://www.11alive.com/story/sports/2015/11/13/states-cracking-down-fanduel-draftkings-ga-still-weighing-options/75734526/.

5

13.     FanDuel claims, in error, that its gambling operations were made legal by the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").

▾ Is this site legal in the US and Canada?

Yes, fantasy sports is considered a game of skill and received a specific exemption from the 2006 Unlawful Internet Gambling Enforcement Act. FanDuel uses exactly same rules as any other season long fantasy sports game, the only difference is that our games last only a day. Thanks to fantasy sports being specifically excluded from laws affecting online betting, FanDuel is safe for players in the US and Canada.

*See* https://www.fanduel.com/p/AddFundsFtd?  However, FanDuel knows that its DFS is not a game of skill but instead is one of chance.

14.     According to a similar website, DrafKings.com, FanDuel's rival DraftKings, Inc. also appears to operate under the misrepresentation that DFS is a game of skill – not chance, and thus legal: "The legality of daily fantasy sports is the same as that of season long fantasy sports.  Federal Law and 45 of the 50 US state allow skill based gaming. Daily fantasy sports are a skill game and are not considered gambling." *See* DraftKings.com.   However, DraftKings, Inc. also knows that its DFS is not a game of skill but instead is one of chance.

15.     In referring to FanDuel, former Congressman Jim Leach stated that his anti-gambling act, the UIGEA, was supposed to stop gambling on the internet – not promote it.   Former Rep. Jim Leach said lawmakers had no idea daily fantasy

6

sports would "morph into today's cauldron of daily betting."[1]  In fact, former Congressman Leach told the Associated Press: "There is no credible way fantasy sports betting can be described as not gambling." *Id.* "Only a sophist can make such a claim." *Id.* The federal regulation is codified at 31 U.S.C. 5361 *et seq.* The Act expressly provides that it shall not be construed as altering, limiting, or extending any state law that prohibits, permits, or regulates gambling within the United States. 31 U.S.C. 5361 § 5361(b).

16.    The Federal Bureau of Investigation and the Department of Justice are also probing whether the business model of DFS operators like FanDuel violates this and other federal laws.[2]

17.    Additionally, on October 15, 2015, the Nevada Gaming Control Board ("NGCB") ordered FanDuel to cease their operations in the State of Nevada, because their operations constitute gambling and they need a gambling license to continue operations in that state.[3]

18.    A day after the NGCB issued its Notice, the State of Nevada Office of the Attorney General ("NOAG") offered its legal analysis, concluding that "[i]n

---

[1] http://bigstory.ap.org/article/7b3af0d8b0c04f059e8b301adf8b1784/former-congressman-says-dfs-cauldron-daily-betting
[2] https://www.washingtonpost.com/news/sports/wp/2015/10/20/draftkings-fanduel-fbi-investigation-could-freeze-daily-fantasy-players-money-for-years/
[3] See NOAG October 15, 2015 Notice, attached hereto as **Exhibit  B**.

7

short, daily fantasy sports constitute sports pools and gambling games. They may also constitute lotteries, depending on the test applied by the Nevada Supreme Court. As a result, pay-to-play daily fantasy sports cannot be offered in Nevada without licensure."[4]

19.     On November 10, 2015, Eric T. Schneiderman of the State of New York Office of the Attorney General sent FanDuel a Notice to Cease and Desist and Notice of Proposed Litigation.[5] According to Attorney General Schneiderman, the Office's "review conclude[d] that FanDuel's operations constitute illegal gambling under New York law . . . ." Moreover, it stated that

> New York Attorney General has been deeply concerned to learn from health and gambling experts that DFS appears to be creating the same public health and economic problems associated with gambling, particularly for populations prone to gambling addiction and individuals who are unprepared to sustain losses, lured by the promise of easy money. Certain structural aspects of DFS make it especially dangerous, including the quick rate of play, the large jackpots, and the false perception that it is eminently winnable. Ultimately, it is these types of harms that our Constitution and gambling laws were intended to prevent in New York.

*Id.* at 2.

---

[4] See NOAG October 16, 2015 Legal Analysis, attached hereto as **Exhibit C**.
[5] See NOTICE TO CEASE AND DESIST AND NOTICE OF PROPOSED LITIGATION PURSUANT TO NEW YORK EXECUTIVE LAW § 63(12) AND GENERAL BUSINESS LAW § 349, dated November 10, 2015, attached hereto as **Exhibit D**.

20.     FanDuel customers are betting on the outcome of athletic feats achieved by sports teams and players over which they have no control, therefore FanDuel's activities constitute the unlawful operation of gambling activities and illegal lotteries within the State of Tennessee.  Regardless of the alleged amount of "skill" that FanDuel attributes to the illegal gambling that it promotes, Tennessee law expressly defines "gambling" to mean "risking anything of value for a profit whose return is ***to any degree contingent on chance***, or any games of chance associated with casinos, including, but not limited to, slot machines, roulette wheels and the like." *See*, TENN. CODE ANN. § 39-17-50l(l) (emphasis added).

21.     In Tennessee, all gambling contract are void as a matter of law. TENN. CODE ANN. § 29-19-101 provides: "All contracts founded, in whole or in part, on a gambling or wagering consideration, shall be void to the extent of such consideration." *See*, TENN. CODE ANN. § 29-19-101.  Additionally, TENN. CODE ANN. § 39-17-501(1) provides that "Gambling is contrary to the public policy of this State . . . ."  Under Tennessee law, then, "when a contract is void, the law treats it as if it never came into existence." *Isbell v. Hatchett*, 2015 Tenn. App., 2015 WL 756883 (Tenn. Ct. App. Feb. 23, 2015).

22.     Further, by charging fees for a chance to win the gaming contests promoted by it (and at times risking its own assets to cover such contests), FanDuel

has operated an illegal lottery in Tennessee. Under Tennessee law, a "lottery" means "the selling of anything of value for chances on a prize or stake." TENN. CODE ANN. § 39-17-501(5). Regardless of the alleged degree of skill that it attributes to the gaming contest created and promoted by FanDuel, FanDuel has engaged in the operation of an illegal lottery in Tennessee (which, as noted above, expressly prohibited by Tennessee law and Article XI, Section 5 of Tennessee's Constitution) because chance is clearly an element affecting the outcome in these contests.

23.     FanDuel takes bets on sporting events or partial sporting events and the performance of players, either full or partial performance, in such events, and such acceptance of bets or gambling consideration are gaming and/or gambling contracts.

24.     FanDuel's DFS is an illegal gambling operation masquerading as a "game of skill." In other words, FanDuel's website, FanDuel.com is an illegal gambling device. Plaintiff Player and Player Class Members paid and did pay wagers to FanDuel through its illegal DFS over the fifteen (15) months prior to the filing of the Original Complaint and FanDuel's operation of the illegal DFS proximately caused Plaintiff Player's and Player Class Members' injuries.

Case 3:15-cv-01432   Document 1   Filed 12/03/15   Page 10 of 45 PageID #: 10

25.    The loser of the bets (gambling consideration and/or money paid) are Plaintiff Player and Player Class Members.

26.    Plaintiff Player and Player Class Members are entitled, as a matter of law, to recover the money they lost, and in addition, are entitled to any and all fees that inured to FanDuel on account of the contracts being void.  Plaintiff Family Member and Family Class Members are entitled, as a matter of law, to recover the money the Plaintiff Player and Player Class Members lost, and in addition, are entitled to any and all fees that inured to FanDuel on account of the contracts being void.

## III.    PARTIES

27.     Plaintiff Player, Martin Backer, is a resident of Davidson County, Tennessee, and is a citizen of Tennessee. He brings this action on behalf of himself individually, and on behalf of Player Class Members (a class of persons similarly situated as described in the class definition below) who, within ninety (90) days preceding the filing of this Class Action Complaint to the present, delivered money to Defendant FanDuel in order to gamble or place wagers on the on-line sports betting site known as "FanDuel.com" and who sustained a monetary loss.

28.    Plaintiff Family Member, Rebecca McGuire, is a resident of Davidson County, Tennessee, and is a citizen of Tennessee.  Ms. McGuire is the mother and

next of kin of Martin Backer. She brings this action on behalf of herself individually, and on behalf of Family Class Members (a class of persons similarly situated as described in the class definition below). More specifically, she is a proposed representative of a class of persons who are affected by FanDuel's illegal gambling activities (including the spouses, or if no spouse, the child or children; and if no child or children, the next of kin as set forth in to TENN. CODE ANN. § 29-19- 105) who are residents of Tennessee and who suffered losses by their family member (Player Class Members) paying money or delivering anything of value to FanDuel within the time period of the last ninety-one (91) days through twelve (12) months preceding the filing of this class action complaint.

29. FanDuel, Inc. is a Delaware corporation with its principal place of business in New York, New York.

30. FanDuel conducts business throughout the State of Tennessee, having thousands of Tennessee residents accessing and gambling on its website FanDuel.com.

31. This Honorable Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331, which confers upon the Court original jurisdiction over all civil actions arising under the laws of the United States. This Honorable Court has jurisdiction pursuant to the Class Action Fairness Act of 2005

12

("CAFA"), 28 U.S.C. 1332 (d), because the proposed class consists of 100 or more members; the amount in controversy exceeds five million ($5,000,000.00) exclusive costs and interest and minimal diversity exists. This Honorable Court has jurisdiction pursuant to diversity jurisdiction, 28 U.S.C. 1332 (a), because the plaintiff and defendants are citizens of different states and the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs. This Honorable Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. 1367. This Honorable Court has personal jurisdiction over FanDuel because it conducts business in Tennessee and solicits citizens of Tennessee on its website, and has sufficient minimum contacts with Tennessee. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because FanDuel has caused harm to Class Members residing in this District.

## IV. FACTUAL BACKGROUND

32. FanDuel is operating an illegal online sports betting business through FanDuel.com within the State of Tennessee.

33.     FanDuel accept wagers from bettors for various sporting events using a scheme they created that assigns values (points) based upon the performance of athletes engaged in amateur and professional athletic competitions.

34.     After the sporting events are concluded, FanDuel calculates a score using the system they created that awards points based upon the various individual college and professional athletes performance. FanDuel then pays the bettors who have the highest total number of points.

35.     Plaintiff Player, Mr. Backer, is an individual who has utilized FanDuel's website.  He has incurred monetary losses as a result of said use. Thus, Defendant FanDuel is indebted to the Plaintiff Player for the money so lost and paid, or received to Plaintiff Player's use, or converted the goods won of the Plaintiff Player to Defendant FanDuel's use for the time period between the filing of the Original Complaint up and until ninety (90) days ago.  Plaintiff Family Member, Mrs. McGuire, is an individual that is the mother of Mr. Backer and lives with Mr. Backer.  She has incurred monetary losses as a result of Mr. Backer's use of the FanDuel's website.  Thus, Defendant FanDuel is indebted to Ms. McGuire for the money so lost and paid, or received to Plaintiff Player's use, or converted the goods won of the Plaintiff Player to Defendant FanDuel's use for the time

period between ninety-one (91) days prior to the filing of the Original Complaint up and until twelve (12) months prior to the filing of the Original Complaint.

36.     Plaintiffs and Class Members allege that gaming on its FanDuel DFS platform requires very little or no skill and that the outcome therefore is determined largely by chance.  In fact, many of FanDuel's  customers lack even a rudimentary understanding of sports, or betting strategy in general, and yet participate in FanDuel's operations, and lose and win based on pure luck.

37.     Within ninety (90) days of the filing of the Original Complaint, Plaintiff Player delivered money to FanDuel which was lost upon a game or wager within the ninety (90) days of said delivery. Within the time period of ninety-one (91) days to twelve (12) months preceding the filing of the Original Complaint, Plaintiff Player has also delivered money to FanDuel which was lost upon a game or wager within the ninety-one (91) days to twelve (12) months of said delivery. Plaintiff Family Member is the mother and next of kin of Plaintiff Player.

38.     FanDuel's sports betting scheme is a game of chance that involves little skill.  The chance element predominates over any skill set.

39.     FanDuel's sports wagering scheme involves selecting a set number of athletes that will play in a single sporting event.

40.     FanDuel establishes a point system that correlates with the athletes' performance during a single athletic event.

41.     FanDuel determines which athletes its bettors can select and assigns a handicap (spread) based upon the athletes' perceived potential to score points.

42.     FanDuel eliminates almost the entire element of skill by establishing a handicap (similar to a point spread) for a limited number of athletes it determines can be used for a particular waging event and by limiting the allotted "salaries" to be used on selecting athletes for a particular wagering event.  As a result, any winnings are made as a result of "sleeper" athletes randomly performing above average.  By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, bettors are engaging in a gambling scheme predominately based upon chance. Indeed, Jason Robins, the Chief Executive Officer of DraftKings, a rival company with a very similar website, stated on Reddit.com (an on-line fantasy sports betting blog) that the concept is "almost identical to a casino."

43.     By establishing a "spread" for each athlete and limiting the number of athletes the bettors can use, along with the "salaries" to be used in selecting athletes, bettors are engaging in a gambling scheme predominately based upon chance.

44.     FanDuel has created an on-line betting website by devising a game that awards points based upon the performance of various professional and college athletes and teams in specific games on specific days. FanDuel charges an entry fee and then accepts wagers from bettors for these sporting event contests, from which it deducts a commission or "rake" in an amount of, upon information and belief, approximately 6.5%. The charging of entries fees and a commission on the dollars wagered by its bettors is the primary basis of FanDuel's revenues; thus, the revenues to FanDuel largely depend upon the price of the entry fee for each contest as well as the total dollars wagered by the bettors in each contest.

45.     FanDuel also frequently guarantees a certain amount will be paid in prize pool winnings for a given sporting contest and, when necessary, covers the difference for the bettors between the guaranteed prize amount and the sum total of entry fees and/or total amounts wagered. The difference between the entry fees and amounts wagered and the guaranteed prize money is known as the "overlay." In situations where an overlay is needed from FanDuel, FanDuel risks its own assets in the gambling ventures it promotes and, thus, has a significant incentive to attract as many bettors as possible in order avoid paying out its own money to cover the overlay.  Once bettors on FanDuel's website have wagered their sums by selecting a given athlete or team, the bettor has no ability to control the outcome of the

17

betting contest. Specifically, FanDuel's bettors have no ability to control how many points their selected athlete or teams will receive from the actual athlete's or team's performance. Instead, only the actual athlete players and teams in the underlying sporting events control their own performances, and even then, these actual athlete and teams are subject to a number of chance variables, such as "bad" officiating, illegal contact, sickness, injury, weather conditions, and any number of other variables well beyond the actual athlete or sporting team's own control. As a result, after FanDuel bettors place their bet by setting their final lineups, they have no ability to influence the outcome of the actual sporting event game. At that point, the bettors wait to see what happens based upon the performance of the actual players and teams selected.

46.    Tennessee's penal law and civil law (and the UIGEA) prohibit FanDuel's sports gambling scheme because it is a game of chance.

47.    According to a survey conducted by the Sports Business Journal, only 1.3% of players realized gains from their participating in online fantasy sports.[6] This is akin to the odds one would find at a casino sports gambling operation.

---

[6] http://www.sportsbusinessdaily.com/Journal/Issues/2015/07/27/Opinion/From-the-Field-of-Fantasy-Sports.aspx.

48.     DFS platforms, including the sports betting scheme implemented by FanDuel, return casino-type "odds" and involve little skill.

49.     A player may win with a randomly generated roster, just as one may win with a carefully curated roster.

50.     FanDuel's gambling scheme is a game of chance because an individual athlete's performance (especially in one game) will always be affected by material elements of chance that affect scoring and winning outcomes including variables such as player injury, fumbles, weather conditions, controversial officiating, suspension, or other off field circumstances.

51.     The bettors or gamblers have no measure of control over all the variables that affect the performance of the college and professional athletes, rendering FanDuel's scheme a game of chance.

52.     Regardless of whether the gaming scheme developed by FanDuel is characterized as predominately one of "skill" or "chance," such characterization is meaningless in Tennessee, as it is well established under Tennessee law that FanDuel is engaged in the promotion and operation of a gambling enterprise because its activities easily encompass "risking anything of value for a profit whose return is to any degree contingent on chance . . . ." as defined TENN. CODE ANN. § 39-17-501(1). Thus, unlike other states' laws that define gambling to be

19

only those activities in which chance· predominates, no such analysis is applicable under Tennessee law—where any degree of chance is involved, gambling is established in Tennessee.

53. Although they have not yet ruled that FanDuel's DFS platform is a website for "gambling," Tennessee Attorney Generals have consistently ruled that any gaming device like that concocted by FanDuel is "gambling" when any degree of chance is present in the game. *See*, Op. Tenn. Att'y. Gen. No. 05-159 (Legality of Texas Hold'Em Poker Tournaments with Jackpot Price, Oct. 14, 2005) (ruling that poker tournaments charging an admission fee to play "Texas Hold'Em" for a chance to win a prize constituted "gambling" as defined under TENN. CODE ANN. § 39-17-501 (1) regardless of the skill involved and was unlawful); Op. Tenn. Att'y. Gen. No. 06-046 (Legality of Leasing Equipment for and Conducting Poker Tournaments, Mar. 10, 2006)(ruling that leasing equipment for and conducting poker tournaments that charge an admission fee to play "Texas Hold'Em" while being designated "for entertainment purposes only" constitutes "gambling" in Tennessee and is unlawful); Op. Tenn. Att'y. Gen. Opinion No. 99-084 (Legality of Fishing Tournament Wherein Entrants Pay Fees With an Opportunity to Receive Cash and Other Prizes, Apr. 5, 1999)(holding that fishing tournament in which participants must pay entry fees for possibility to receive cash and other prizes for

catching specifically designated fish was "gambling" despite skill involved because it involve a degree of chance).

54.    Based upon the facts alleged herein, FanDuel also promotes, operates and manages an illegal lottery in violation of Tennessee's Constitution and Tennessee statutory law.  Pursuant to TENN. CODE ANN. § 39-17-501(5), a "lottery" means "the selling of anything of value for chances on a prize or stake." The three elements of a lottery are: consideration, prize and chance. As alleged above all three elements are present with respect to FanDuel's gaming platform. First, Plaintiff Player and all bettors, including Player Class Members, pay money to FanDuel for the ability to participate in the gaming contests. Second, Plaintiff Player and all bettors, including Player Class Members, are offered a monetary prize which, if won, would greatly exceed the amount wagered and paid to FanDuel. Lastly, there clearly is an element of chance with respect to FanDuel's gaming website. Once again, Tennessee Attorney Generals and Tennessee law holds that it is the particular character of the game—and not the skill or lack of skill of an individual participant that determines whether the game at issue is one of chance or skill. *See*, Op. Tenn. Att'y. Gen. No. 05-159 (Legality of Texas Hold'Em Poker Tournaments with Jackpot Price, Oct. 14, 2005) (ruling that poker tournaments charging an admission fee to play "Texas Hold'Em" for a chance to

win a prize constituted a "lottery" as defined under TENN. CODE ANN. § 39-17-501(5) despite the alleged skill involved in playing live poker); Op. Tenn. Att'y. Gen. Opinion No. 94-127 (Video Poker Machines as Lotteries, Nov. 1, 1994) (holding that video poker, although it involves skill, is a game of chance and hence a lottery).

55.    As alleged above, FanDuel's bettors can acquire and exercise the all the knowledge in the world as to which actual athlete and team may a better performer over other athletes and teams but this skill (while it theoretically could increase the odds of winning—though studies show that it does not) ultimately does not determine the outcome—instead, it is only the actual athlete and sporting team that have any semblance of control of the actual outcome, and even these actual sporting participants are subject to chance. FanDuel's gambling scheme clearly involve a significant degree of chance because an individual athlete's performance will always be affected by material elements of chance that affect scoring and winning outcomes including variables such as player injury, player error, weather conditions, controversial officiating, suspension, or other off field circumstances and other conditions well beyond the control of the actual athlete or team. FanDuel's bettors have no measure of control over all of the variables that affect the performance of the college and professional athletes that they select, and,

thus, FanDuel has, in addition to engaging in gambling, promoted and conducted an illegal lottery in Tennessee.

56. FanDuel represents that its gambling scheme is not illegal.

57. FanDuel's representation that the UIGEA legalized bookmaking and gambling under the guise of "fantasy sports" is false and misleading.

58. The UIGEA did not legalize fantasy sports, it merely provided an exemption to banks from being held liable for processing transactions relating to certain fantasy sports.

59. The UIGEA was enacted to regulate banks and other payment processors, not bookmakers.

60. Under the UIGEA's definition, unlawful internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet" that is illegal under federal, state, or tribal law.

61. Tennessee law prohibits sports gambling schemes, including FanDuel's, and prohibits FanDuel from accepting payments from or entering into gambling contracts with persons in Tennessee, including Plaintiff Player and Player Class Members.

## V.  INVALIDITY OF ARBITRATION PROVISION, CLASS WAIVER, AND TERMS OF USE

62.  FanDuel's Terms of Use is not a valid, enforceable contract.

63.  Plaintiff Player and Player Class Members were fraudulently induced into placing money onto FanDuel's platform because it was supposed to be a fair game of skill, but instead is no more than a game of chance, thus illegal gambling under Tennessee law.

64.  The site contains a hidden "Terms of Use" page.  Plaintiff Player and Player Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use," and in fact did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class.  Upon review, it appears that a link called "Terms of Service" appears as a greyed out link in small text on the bottom of the sign up page and is specifically designed in a way to make sure terms are unnoticeable.  The relevant, miniscule text says "Joining confirms you're 18+ years of age and that you agree to our ***Terms of Service***.  There does not appear to be any "Terms of Service" on the FanDuel.com website, though the link leads to a document called "Terms of Use."



65.    In fact, the place where you make payment for the gambling monies on FanDuel.com does not even have the small greyed out text or any link or reference whatever to the "Terms of Service," never mind "Terms of Use." *See* https://www.fanduel.com/p/AddFundsFtd? Moreover, when signing into FanDuel.com at any particular time, no "Terms of Use" are referenced or otherwise shown.

66.     Plaintiff Player and Player Class Members are not required to sign, initial, check any boxes, or otherwise confirm that they agreed to the arbitration and class waiver sections of the "Terms of Use" and did not assent to or agree to arbitrate any claims or waive their right to bring any claims as a class.

67.     As a result of all of the foregoing numbered paragraphs, Plaintiff Player and Player Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with FanDuel.

68.     Regardless, the so-called "Terms of Use" do not constitute a valid, mutual agreement because the promises made by FanDuel are illusory.  Indeed, there is no restriction on FanDuel's ability to terminate the "agreement" or to refuse to perform.  For example, the so-called "Terms of Use" provide that

FanDuel and related individuals such as officers and directors are released from any liability for any claim by the user whatsoever: "You agree to release and to indemnify, defend and hold harmless FanDuel and its parents, subsidiaries, affiliates and agencies, as well as the officers, directors, employees, shareholders and representatives of any of the foregoing entities, from and against any and all losses, liabilities, expenses, damages, costs (including attorneys' fees and court costs) claims or actions of any kind whatsoever arising or resulting from your use of the Service, your violation of these Terms of Use, your receipt, ownership, use or misuse of any prize, and any of your acts or omissions that implicate publicity rights, defamation or invasion of privacy." *See* https://www.fanduel.com/terms

69. Another reason why the so-called "Terms of Use" is an illusory contract is that it purports to reserve to FanDuel the right to deny service to any user for any reason whatsoever: "You acknowledge and agree that FanDuel may remove any User Content and terminate any FanDuel account at any time for any reason (including, but not limited to, upon receipt of claims or allegations from third parties or authorities relating to such User Content)." Thus, FanDuel is not bound to any performance obligation. *See* https://www.fanduel.com/terms

70. Yet another reason why the so-called "Terms of Use" is an illusory contract is that it purports to give FanDuel the right "to cancel contests, in our sole

27

discretion, without any restrictions." Thus, once again, FanDuel is not bound to any performance obligation. *See* https://www.fanduel.com/terms

71.     Further, the entirety of the contracts between FanDuel and Plaintiff Player and Player Class Members are void as a matter of law (as noted herein), including any arbitration or class waiver provisions in the "Terms of Use."

72.     The Terms of Use are procedurally and substantively unconscionable.

**Plaintiff Player and Player Class Members Had No Agreement to Arbitrate or Waive Class Claims With FanDuel**

73.     As a result of all of the information provided in the foregoing numbered paragraphs, Plaintiff Player and Player Class Members did not assent or agree to arbitrate any claims or waive their right to bring any claims as a class for any gambling contract formed with FanDuel.

74.     Further, the entirety of the contracts between FanDuel and Plaintiff Player and Player Class Members are void as a matter of law (as noted herein), including any alleged arbitration or class waiver agreements or provisions in the "Terms of Use."

75.     Alternatively, any alleged arbitration or class waiver provision or agreement included in any Terms of Use is based on illegal and/or invalid consideration, making any alleged arbitration provision or agreement between FanDuel and Plaintiff Player and Player Class Members invalid as a matter of law.

28

76.     Moreover, any alleged arbitration or class waiver agreement or provision is procedurally and substantively unconscionable.

### Plaintiff Family Member and Family Class Members Had No Agreement to Arbitrate or Waive Class Claims With FanDuel

77.     Plaintiff Family Member and Family Class Members had no agreement with FanDuel to arbitrate or waive class claims.  In fact, Plaintiff Family Member and Family Class Members had no agreement whatsoever with FanDuel.  Plaintiff Family Member and Family Class Members did not sign up on the FanDuel website to allow Plaintiff Player and/or Player Class Members to participate in any gambling contest or game on FanDuel.com.

78.     As a direct and proximate result of the actions described above, Plaintiffs and Class Members have been damaged.

## VI.    CLASS ALLEGATIONS

79.     A class action is the proper form to bring Plaintiffs claims under Federal R. Civ. Proc. 23. The potential class is so large that joinder of all members would be impracticable. Additionally, there are questions of law or fact common to the class, the claims or defenses of the representative parties are typical of the claims or defenses of the class, and the representative parties will fairly and adequately protect the interests of the classes.

29

80.     This action satisfies all of the requirements of Federal R. Civ. Proc. 23, including numerosity, commonality, typicality, adequacy, predominance and superiority.

81.     **Numerosity:** the Classes are so numerous that joinder of all members is impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery. News accounts discuss how millions of users compete on the websites of Defendant.

82.     **Commonality**: the claims made by Plaintiffs and Class Members meet the commonality requirement because they present shared questions of law and fact, and resolving these questions will resolve the class wide litigation. These shared questions predominate over individual questions, and they include, without limitation:

a)     Whether Plaintiff Player and Player Class Members have entered into contracts with FanDuel within the past year.

b)     Whether the promotion and operation of FandDuel.com constitutes "gambling" as defined by TENN.CODE ANN. § 39-17-501(1);

c)     Whether the promotion and operation of FandDuel.com constitutes an illegal "lottery" as defined by TENN. CODE ANN. § 39-17-501(5);

d) Whether the contracts entered into between FanDuel and Plaintiff Player and Player Class Members are gambling contracts supported by "gambling consideration";

e) Whether such contracts are per se void, pursuant to Tennessee law;

f) Whether FanDuel's operations are an illegal lottery under Tennessee law;

g) Whether FanDuel promoted, advanced and profited from illegal gambling in violation of Tennessee law;

h) Whether FanDuel intentionally or recklessly engaged wrongful conduct such as to warrant punitive damages.

i) Whether Plaintiffs and Class Members have been damaged,

j) Whether the Terms of Use are unconscionable, illusory, fraudulent or otherwise invalid;

k) Whether Plaintiff Player and Player Class Member entered into an agreement with FanDuel to arbitrate and waive class claims.

83. **Typicality:** Plaintiffs' claims are typical of those of the other Class members because Plaintiff Player, like every other Player Class Member, were induced to use FanDuel's site based on false and misleading advertisements that DFS was a game of skill when, in fact, it is a game of chance, thus constituting

illegal gambling under Tennessee law. Plaintiff Family Member and Family Class Members were also affected financially by said advertisements directed to Plaintiff Player and Player Class Members.

84.     The claims of the class representative Plaintiffs are furthermore typical of other Class Members because they make the same claims as other Class Members; and Plaintiffs' claims and those of the Class Members are based upon the same legal theories, and arise out of the same practices and course of conduct engaged in by FanDuel. Plaintiffs have an interest in seeking compensation from FanDuel on behalf of all Class Members.

85.     Further, the representative Plaintiffs' damages arise out of nearly identical and repetitive policies and practices engaged in by FanDuel.

86.     **Adequacy:** Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that they have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages they have suffered are typical of other Class Members.

87.     **Superiority:** The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to

32

all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a large corporate defendant like FanDuel. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical.

88.     The nature of this action and the nature of Tennessee laws available to Plaintiffs and the Class Members makes the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and the Class Members for the wrongs alleged because FanDuel would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Members with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class Members and will establish the right of each Class Members to recover on the cause of

Case 3:15-cv-01432   Document 1   Filed 12/03/15   Page 33 of 45 PageID #: 33

action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

89.     The proposed "Classes" are described as follows:

**"All persons in the State of Tennessee who participated in FanDuel's DFS, deposited money in a FanDuel account, and lost money in any game or contest during the ninety days prior to filing the original complaint" (the "Player Class")**

**"All persons in the State of Tennessee that are spouses, children, or next of kin of a person in the State of Tennessee that participated in FanDuel's DFS, deposited money in a FanDuel's account, and lost money in any game or contest going for the time period starting ninety-one days ago up until one year prior to filing the original complaint." (the "Family Class," and together with the Player Class, the "Class(es)")**

90.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes and to modify, amend, add or remove proposed subclasses, before the Court determines whether certification is appropriate and as the parties engage in discovery.

91.     Excluded from the Classes are:

a. FanDuel and any entities in which FanDuel has a controlling interest;

b. Any entities in which FanDuel's officers, directors, or employees are employed and any of the legal representatives, heirs, successors, or assigns of FanDuel;

c. The Judge to whom this case is assigned and any members of the Judge's immediate family and any other judicial officer assigned to this case;

d. All persons or entities that properly execute and timely file a request for exclusion from the Classes;

e. Any attorneys representing the Plaintiffs or the Classes.

## I. COUNT I—VIOLATION OF TENNESSEE CODE ANNOTATED § 29-19-104 & 5: UNLAWFUL GAMBLING OR WAGERING PROMOTION, MANAGEMENT AND OPERATION

92. Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

93. Plaintiff Player represents himself and all Player Class Members in this Count and asserts this Count on behalf of the same. Plaintiff Family Member represents herself and all Family Class Members in this Count and asserts this Count on behalf of the same.

94. TENN. CODE ANN. § 29-19-l 04 provides:

35

Any person who has paid any money, or delivered anything of value, lost upon any game or wager, may recover such money, thing, or its value, by action commenced within ninety (90) days from the time of such payment or delivery.

95.     Plaintiff Player and the Player Class Members paid money or delivered money or other things of value (namely the charging of credit against their credit cards or money) to FanDuel during the ninety (90) days preceding the filing of this Original Complaint, which was lost upon a game or wager within the ninety (90) days of said payment or delivery. The payment or delivery of said money or credit resulted in a loss to Plaintiff Player and Player Class Members for which FanDuel is obligated to return under TENN. CODE ANN. § 29-19-104 because, as alleged above, FanDuel's activities in Tennessee constitute "gambling" as defined under TENN. CODE ANN. § 39-17-501(1), which is against public policy and unlawful.

96.     TENN. CODE ANN. § 29-19-105 provides:

Any other person may, after the expiration of the ninety (90) days, and within twelve (12) months thereafter, recover the amount of such money, thing, or its value, by action for the use of the spouse; or, if no spouse, the child or children; and, if no child or children, the next of kin of the loser.

97.     Within the ninety-one (91) days to twelve (12) months preceding the filing of this Original Complaint, Plaintiff Player, and Player Class Members, also delivered money to FanDuel which was lost upon a game or wager within the

36

ninety-one (91) days to twelve (12) months of said delivery. Plaintiff Family Member is the mother and next of kin of Plaintiff Player and, therefore, has the right to bring an action on behalf of herself and the Family Class under TENN. CODE ANN. § 29-19-105 because, as alleged above, FanDuel's activities in Tennessee constitute "gambling" as defined under TENN. CODE ANN. § 39-17-50 I (1), which is against public policy and unlawful.

## II. COUNT II—VIOLATION OF TENN. CODE ANN. § 29-19-104 & 5 - UNLAWFUL PROMOTION AND OPERATION OF A LOTTERY

98. Plaintiffs and Class Members repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

99. Plaintiff Player represents himself and all Player Class Members in this Count and asserts this Count on behalf of the same. Plaintiff Family Member represents herself and all Family Class Members in this Count and asserts this Count on behalf of the same.

100. As alleged above, FanDuel's gaming and operations constitute a lottery under TENN. CODE ANN. § 39-17-501(5), which defines a "lottery" as "the selling of anything of value for chances on a prize or stake."

101. Article XI, Section 5 of Tennessee's Constitution expressly forbids lotteries unless they are authorized, "state" run lotteries for educational purposes. As a result, the Tennessee Constitution expressly bars the lotteries that were

37

created, managed and conducted by FanDuel. Further, pursuant to TENN. CODE ANN. § 39-17-506, lotteries involving ten thousand dollars ($ 10,000.00) or more constitute a Class E felony in Tennessee.

102. Lotteries are a form of gambling as set forth in TENN. CODE ANN. § 39-17-501. Further, lotteries constitute a "game or wager" as set forth in TENN. CODE ANN. § 29-10-104. Plaintiff Player and Player Class Members paid money or delivered money or other things of value (namely the charging of credit against their credit cards or money) to FanDuel during the ninety (90) days preceding the filing of this Original Complaint which was lost upon a game or wager within the ninety days (90) of said payment or delivery. The payment or delivery of said money or credit resulted in a loss to Plaintiff Player and Player Class Members for which FanDuel is obligated to return under TENN. CODE ANN. § 29-19-104 because, as alleged above, FanDuel's activities in Tennessee constitute "lotteries" as defined under TENN. CODE ANN. § 39-17-501(5), which are against public policy and Tennessee law.

103. Within the time period of ninety-one (91) days through twelve (12) months preceding the filing of this Original Complaint, Plaintiff Player also delivered money to FanDuel which was lost upon a game or wager within this same time period. Plaintiff Family Member is the mother and next of kin of

Plaintiff Player and, therefore, has a right to bring action on behalf of herself and the Family Member Class under TENN. CODE ANN. § 29-19-105 because, as alleged above, FanDuel's gaming contests in Tennessee constitute "lotteries" as defined under TENN. CODE ANN. § 39-17-501 (5), which are against public policy and unlawful under Tennessee law.

### III. COUNT III—PUNITIVE DAMAGES

104. Plaintiffs repeat, reallege, and incorporate by reference each of the foregoing allegations as though fully set forth herein.

105. Plaintiff Player represents himself and all Player Class Members in this Count and asserts this Count on behalf of the same. Plaintiff Family Member represents herself and all Family Class Members in this Count and asserts this Count on behalf of the same.

106. TENN. CODE ANN. § 39-17-502 provides that the offence of gambling is a Class C misdemeanor. TENN. CODE ANN. § 39-17-503 provides that the promotion of gambling is a Class B misdemeanor; "gambling promotion" occurs when anyone "knowingly induces or aids another to engage in gambling, and: (1) intends to derive or derives an economic benefit other than personal winnings from the gambling; or (2) participates in the gambling and has, other than by virtue of skill or luck, a lesser risk of losing or greater chance of winning than one or more

39

of the other participants." *See*, TENN. CODE ANN. § 39-17-503(a). As alleged above, FanDuel has induced Plaintiff Adam Walls and the Class Members to gamble and it derived an economic benefit other than personal gambling winnings.

107.  TENN. CODE ANN. § 39-17-504 provides that aggravated gambling promotion is a Class E felony; aggravated gambling promotion occurs when one "knowingly invests in, finances, owns, controls, supervises, manages or participates in a gambling enterprise [meaning two (2) or more persons regularly engaged in gambling promotion]." *See*, TENN. CODE ANN. § 39-17-504(a) & (b). As alleged above. FanDuel's conduct and activities constitutes aggravated gambling promotion.

108.  Upon information and belief, FanDuel acted intentionally and/or recklessly with respect to its wrongful conduct because it was aware, but consciously disregarded, the substantial and unjustifiable harm that they would cause to Plaintiffs and the Class Members for engaging in gambling and illegal lotteries. As a result, FanDuel's actions and omissions constituted a reckless and/or gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

109. With respect to the applicable factors that may be addressed by the fact finder when determining punitive damages, Plaintiffs and Class Members would allege as follows:

(i) FanDuel's financial affairs, financial condition and net worth range in the multimillions of dollars;

(ii) The nature and reprehensibility of FanDuel's wrongdoing is substantial because FanDuel have intentionally or recklessly abused and taken advantage of a class of persons who are generally in financial straits and are low income consumers;

(iii) FanDuel was aware of the harm that could and would be caused to Plaintiffs and the Class Members with respect to their wrongful conduct;

(iv) FanDuel's misconduct spanned several years;

(v) In order to recover their losses, Plaintiffs and the Class Members will incur substantial costs;

(vi) FanDuel profited significantly from the unlawful and illegal fees, and a significant punitive award is the only method to deter future similar misconduct.

110. Indeed, FanDuel has known that its gambling and lottery activities in Tennessee are strictly illegal. For example, on or about November of 2015,

FanDuel hired Tennessee lobbyists David McMahan, Scott Ward, Erica Sechrist, Anna Richardson, Caroline Straight and Beth Winstead for the express purpose of attempting to lobby the Tennessee General Assembly to change the laws of Tennessee which expressly prohibit gambling and non-state run lotteries in Tennessee. *See* https://apps.tn.gov/ilobbysearch-app/results.jsp. Based upon the above allegations and factors, Plaintiffs and the Class Members would respectfully request entry of a punitive award in an amount to be determined by the trier of fact.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and members of the Class Members pray for relief and judgment against FanDuel, as follows:

a. For an order certifying the Classes, appointing Plaintiffs and their counsel to represent the Classes and notice to the Classes to be paid by FanDuel;

b. For a declaration that FanDuel's DFS gambling platforms/devices are illegal under Tennessee law;

c. For a declaration, pursuant to TENN. CODE ANN. § 29-14-103 and 104, that any contractual terms allegedly entered into by Plaintiff Player and Player Class Members are void as against public policy and Tennessee law;

42

d.      For a declaration, pursuant to TENN. CODE ANN. § 29-14-103 and 104, that FanDuel's activities alleged herein violate Tennessee's Constitution and Tennessee statutory law which prohibits gambling and lotteries;

e.      For damages suffered by Plaintiffs and the proposed Class Members;

f.      For restitution to Plaintiffs and the proposed Class Members of all monies wrongfully obtained by FanDuel;

g.      For injunctive relief requiring FanDuel to cease and desist from engaging in the unlawful, unfair, illegal, and/or deceptive practices alleged in this operative Complaint;

h.      An order awarding declaratory relief, retrospective and prospective injunctive relief as permitted by law or equity, including enjoining FanDuel from continuing the unlawful practices as set forth herein, and injunctive relief to remedy FanDuel's past conduct;

i.      For Plaintiffs' reasonable attorneys' fees, as permitted by law;

j.      For Plaintiffs' costs incurred;

k.      For pre-judgment and post-judgment interest at the maximum allowable rate on any amounts awarded; and

43

l.      For such other and further relief that this Court deems just and proper under equity or law, including the award of punitive damages.

DATED: December 3, 2015.          Respectfully submitted,

                                  */s/ Lee L. Coleman*

BENJAMIN COLEMAN                  LEE L. COLEMAN
BColeman@hughesandcoleman.com     (TN Bar #33979)
*PHV forthcoming*                 LColeman@hughesandcoleman.com
**HUGHES & COLEMAN**              **HUGHES & COLEMAN**
2333 Alexandria Drive, Suite 118  446 James Robertson Pkwy, Suite 100
Lexington, KY 40504               Nashville, TN 37219
Tel: 859-260-1722                 Tel: 615-255-9100


W. LEWIS GARRISON, JR.,           JAMES F. MCDONOUGH, III.
*PHV forthcoming*                 *PHV forthcoming*
lewis@hgdlawfirm.com              jmcdonough@hgdlawfirm.com
CHRISTOPHER HOOD,                 **HENINGER GARRISON DAVIS, LLC**
*PHV forthcoming*                 3621 Vinings Slope, Suite 4320
chood@hgdlawfirm.com              Atlanta, GA 30339
TAYLOR C. BARTLETT,               Tel: 404-996-0869
*PHV forthcoming*                 Fax: 205-326-3332
taylor@hgdlawfirm.com
**HENINGER GARRISON DAVIS, LLC**
2224 First Avenue North
Birmingham, AL 35203
Tel: 205-326-3336
Fax: 205-326-3332

***Attorneys for Plaintiffs and putative Class Members***